NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 14-7082

─────────────────────────────────────────

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ROSALIE SIMON, et al.,

Plaintiffs-Appellants,

v.

REPUBLIC OF HUNGARY, et al.,

Defendants-Appellees.

─────────────────────────────────────────

Appeal from the United States District Court for the District of Columbia

The Honorable Beryl A. Howell

─────────────────────────────────────────

## OPPOSITION BRIEF OF DEFENDANTS-APPELLEES THE REPUBLIC OF HUNGARY AND MAGYAR ÁLLAMVASUTAK ZRT.

─────────────────────────────────────────

Konrad L. Cailteux
Gregory Silbert
B. Keith Gibson
Isabella C. Lacayo
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
Konrad.Cailteux@weil.com
Gregory.Silbert@weil.com
Keith.Gibson@weil.com
Isabella.Lacayo@weil.com

*Attorneys for Defendants-Appellees The Republic of Hungary and Magyar Államvasutak Zrt.*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Defendants-Appellees The Republic of Hungary ("Hungary") and Magyar Államvasutak Zrt. ("MÁV"), by and through their undersigned counsel, hereby certify as follows:

### A.    Parties

The Plaintiffs-Appellants are Rosalie Simon, Helen Herman, Charlotte Weiss, Helena Weksberg, Rose Miller, Tzvi Zelikovitch, Magda Kopolovich Bar-Or, Zehava (Olga) Friedman, Yitzhak Pressburger, Alexander Speiser, Ze-ev Tibi Ram, Vera Deutsch Danos, Ella Feuerstein Schlanger, and Moshe Perel.

The Defendants-Appellees are Hungary and MÁV.

### B.    Ruling Under Review

The ruling under review is the May 9, 2014 Memorandum Opinion and the associated May 9, 2014 Order of the United States District Court for the District of Columbia (Howell, J.) in *Simon v. Republic of Hungary*, Civil Action No. 1:10-cv-0177-BAH, granting Defendants-Appellees' motion to dismiss.  The Memorandum Opinion and the associated Order are found in the Joint Appendix ("JA-") at 316-414.

### C.    Related Cases

This case has not previously been before this Court or any other court. Hungary and MÁV are aware of the following potentially related cases:  *Abelesz v.*

i

*Magyar Nemzeti Bank*, 11-2387 (7th Cir. filed June 20, 2011); *Fischer v. Magyar Államvasutak Zrt.*, No. 13-3073 (7th Cir. filed Feb. 13, 2014); *Somogyi. v. Magyar Nemzeti Bank*, Appeal No. 14-1319 (7th Cir. filed Feb. 13, 2014); *de Csepel v. Republic of Hungary*, No. 11-8031 (D.C. Cir. filed Dec. 9, 2011); *de Csepel v. Republic of Hungary*, Civil Action No. 10-1261 (ESH) (D.D.C. filed July 27, 2010) (proceedings on remand).

## DISCLOSURE STATEMENT PURSUANT TO RULE 26.1

Hungary is a sovereign nation.  MÁV is the Hungarian national railway company.  MÁV is 100% owned by Hungary.   MÁV has no parent corporations. No publicly traded company holds a 10% or greater ownership interest in MÁV.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

    A.    Parties .........................................................................................i

    B.    Ruling Under Review ..........................................................i

    C.    Related Cases ......................................................................i

DISCLOSURE STATEMENT PURSUANT TO RULE 26.1 ............................. iii

TABLE OF AUTHORITIES ...............................................................vi

GLOSSARY OF ABBREVIATIONS ....................................................xi

JURISDICTIONAL STATEMENT .......................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................2

STATEMENT OF THE CASE.............................................................3

    A.    Factual Background.............................................................3

        1.    The Treaty Ending World War II................................3

        2.    Hungary's Compliance With The Treaty.....................6

    B.    Proceedings Below ...........................................................9

SUMMARY OF THE ARGUMENT ....................................................10

ARGUMENT ............................................................................13

I.    THE 1947 PEACE TREATY IS AN EXISTING INTERNATIONAL
    AGREEMENT THAT BARS SUBJECT MATTER JURISDICTION
    OVER PLAINTIFFS' CLAIMS EVEN IF AN FSIA EXCEPTION
    TO HUNGARY'S OR MÁV'S SOVEREIGN IMMUNITY APPLIES ......13

    A.    The 1947 Peace Treaty Governs The Disposition Of The
        Property That Is The Subject Of This Action And Renders
        Hungary And MÁV Immune From Suit By Providing An
        Exclusive Mechanism And Forum For Disputes Concerning
        Treaty Obligations..........................................................14

B. Plaintiffs Cannot Overcome The Express Conflicts Between This Action And The 1947 Peace Treaty .............................................19

II. HUNGARY AND MÁV ARE IMMUNE FROM SUIT IN THE UNITED STATES BECAUSE PLAINTIFFS CANNOT SHOW THAT THE FSIA'S EXPROPRIATION EXCEPTION APPLIES TO THEIR CLAIMS ..............................................................................26

A. Plaintiffs Cannot Show Any Taking Of Property In Violation Of International Law ...........................................................27

1. Plaintiffs Have Not Shown That They Have Exhausted Their Hungarian Remedies ......................................27

2. A Nation's Expropriation Of Property From Its Own Nationals Does Not Violate International Law .......................31

B. Plaintiffs Have Not Pled Any Factual Allegations That Would Plausibly Establish That The Expropriation Exception Deprives Hungary Or MÁV Of Their Immunity In This Case .........................35

C. Plaintiffs Cannot Pursue Their Non-Property Claims Under The FSIA's Expropriation Exception ...........................................40

III. PLAINTIFFS' CLAIMS PRESENT NON-JUSTICIABLE POLITICAL QUESTIONS ..................................................42

A. The United States Executive Branch Has Addressed Hungary's Holocaust-Related Obligations In The 1947 Peace Treaty and the 1973 Executive Agreement ...........................................43

B. Post-War Reparations Claims Have Traditionally Been Resolved Through Diplomatic Negotiations, Not Litigation..............48

CONCLUSION.....................................................................55

CERTIFICATE OF COMPLIANCE.......................................................56

CERTIFICATE OF SERVICE ............................................................57

v

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abelesz v. MÁV,*
692 F.3d 661 (7th Cir. 2012) ......................................................1, 13, 23, 27-29, 32-34, 39, 40

*Agudas Chasidei Chabad v. Russian Fed'n,*
528 F.3d 934 (D.C. Cir. 2008) ..................................................................................29

*Agudas Chasidei Chabad v. Russian Fed'n,*
466 F. Supp. 2d 6 (D.D.C. Cir. 2006) ....................................................................29

*Alperin v. Vatican Bank,*
410 F.3d 532 (9th Cir. 2005) ..............................................................................51, 52

*Altmann v. Fed. Republic of Austria,*
317 F.3d 954 (9th Cir. 2002) ..................................................................................32

*Am. Ins. Ass'n v. Garamendi,*
539 U.S. 396 (2003) ............................................................................................49, 50

*Argentine Republic v. Amerada Hess Shipping Corp.,* ................................1, 10, 13, 20, 21, 2324
488 U.S. 428 (1989)

*Baker v. Carr,*
369 U.S. 186, 217 (1962) ....................................................................... 43-45, 49

*Ashcroft v. Iqbal,*
129 S. Ct. 1937 (2009) ..............................................................................................39

*Belk v. United States,*
858 F.2d 706 (Fed. Cir. 1988) ................................................................................49

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2004) ..................................................................................................39

*Burger-Fischer v. Degussa A.G.,*
65 F. Supp. 2d 248 (D.N.J. 1999) ....................................................................22, 25, 48

*Cassirer v. Kingdom of Spain,*
616 F.3d 1019 (9th Cir. 2010) ................................................................................29

*Chettri v. Nepal Bangladesh Bank, Ltd.,*
No. 10 Civ. 8470, 2014 WL 4354668 (S.D.N.Y. Sept. 2, 2014) ............................39

*Cicippio v. Islamic Republic of Iran*,
 30 F.3d 164 (D.C. Cir. 1994) ................................................................. 40

*Ciralsky v. C.I.A.*,
 355 F.3d 661 (D.C. Cir. 2004) ............................................................... 2

*Crist v. Republic of Turkey*,
 995 F. Supp. 5 (D.D.C. 1998) ................................................................ 36

*Dames & Moore v. Regan*,
 453 U.S. 654 (1981) ............................................................................. 49

*Dar-el Bina Eng'g & Contracting Co. v. Republic of Iraq*,
 79 F. Supp. 2d 374 (S.D.N.Y. 2000) ...................................................... 41

*de Csepel v. Republic of Hungary*,
 808 F. Supp. 2d 113 (D.D.C. 2011) .................................................. 28, 34

*de Sanchez v. Banco Central de Nicaragua*,
 770 F.2d 1385 (5th Cir. 1985) .......................................................... 34, 35

*Doe v. Rumsfeld*,
 683 F.3d 390 (D.C. Cir. 2012) ............................................................... 2

*Fischer v. MÁV*,
 Case No. 10 C 868 (N.D. Ill. filed Feb. 9, 2010) ................................... 23

*Foremost-McKesson, Inc. v. Islamic Rep. of Iran*,
 905 F.2d 438 (C.A.D.C. 1990) ............................................................. 21

*Freund v. Republic of France*,
 592 F. Supp. 2d 540 (S.D.N.Y. 2008) .................................................... 36

*Greenpeace v. State of France*,
 946 F. Supp. 773 (C.D. Cal. 1996) ....................................................... 18

*Haven v. Polska*,
 215 F.3d 727 (7th Cir. 2000) ............................................................... 41

*Iwanowa v. Ford Motor Co.*,
 67 F. Supp. 2d 424 (D.N.J. 1999) ......................................................... 48

*Joo v. Japan*,
 413 F.3d 45 (D.C. Cir. 2005) ............................................................... 44

*Kadic v. Karadzic*,
 70 F.3d 232 (2d. Cir. 1995) ................................................................. 53

*Kelberine v. Societe Internationale, Etc.*,
    363 F.2d 989 (D.C. Cir. 1966) ..................................................50

*Kiobel v. Royal Dutch Petroleum Co.*,
    133 S. Ct. 1659 (2013)..................................................31, 51

*Millicom Int'l Cellular v. Republic of Costa Rica*,
    995 F. Supp. 14 (D.D.C. 1998) ..................................................27

*\*Moore v. U.K.*,
    384 F.3d 1079 (9th Cir. 2004) ..................................13, 17, 18, 19

*Nat'l Bank of Wash. v. Mallery*,
    669 F. Supp. 22 (D.D.C. 1987) ..................................................33

*In re Nazi Era Cases Against German Defendants Litig.*,
    129 F. Supp. 2d 370 (D.N.J. 2001) ..................................................50

*Nemariam v. Fed. Democratic Republic of Ethiopia*,
    491 F.3d 470 (D.C. Cir. 2007), *reh'g denied*..................................27

*Oetjen v. Central Leather Co.*,
    246 U.S. 297 (1918)..................................................48, 49

*Princz v. Fed. Republic of Germany*,
    26 F.3d 1166 (D.C. Cir. 1994) ..................................................21

*Republic of Austria v. Altmann*,
    541 U.S. 677 (2004)..................................................28, 52

*Rong v. Liaoning Provincial Gov't*,
    362 F. Supp. 2d 83 (D.D.C. 2005) ..................................................31, 33

*Rosner v. United States*,
    231 F. Supp. 2d 1202 (S.D. Fla. 2002) ..................................................39

*Sampson v. Fed. Republic of Germany*,
    250 F.3d 1145 (7th Cir. 2001) ..................................................41

*Siderman de Blake v. Republic of Argentina*,
    965 F.2d 699 (9th Cir. 1992) ..................................................21, 32, 41

*Smith v. Socialist People's Libyan Arab Jamahiriya*,
    101 F.3d 239 (2nd Cir. 1996)..................................................21

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004)..................................................28, 31

*Supreme Tribe of Ben Hur v. Cauble*,
   255 U.S. 356 (1921)..................................................................................33

*In re Terrorist Attacks on Sept. 11, 2001*,
   538 F.3d 71 (2d Cir. 2008)......................................................................41

*Ungaro Benages v. Dresdner Bank AG*,
   379 F.3d 1227 (11th Cir. 2004) ..............................................................53

*United States v. Martinez*,
   904 F.2d 601 (11th Cir. 1990) .................................................................49

*United States v. Pink*,
   315 U.S. 203 (1942)..................................................................................49

*United States v Portrait of Wally*,
   NO. 99 CIV. 9940, 2002 WL 553532 (S.D.N.Y. APR. 12, 2002) .........52

*Whiteman v. Dorotheum*,
   431 F.3d 57 (2d. Cir. 2005)................................................................44, 49

# STATUTES AND REGULATIONS

**Page(s)**

**Statutes**

28 U.S.C. § 1350...................................................................................................42, 50

28 U.S.C. § 1604.......................................................................9-11, 13, 14, 17-23, 26

28 U.S.C. § 1605(5).............................................................................................35

28 U.S.C. § 1605(a)..............................................................................................33

28 U.S.C. § 1605(a)(3)...........................................................10, 11, 26, 31, 32, 34

28 U.S.C. § 1605(a)(5)..........................................................................................41

28 U.S.C. § 1606..................................................................................................42

**Other Authorities**

Restatement (Third) of the Foreign Relations Law of the United States § 713............................28

Treaty of Peace with Hungary, Feb. 10, 1947,
    61 Stat. 2065 ........................................................1-9, 11-15, 17, 19-24, 26, 37, 42-43, 45-47

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| ECF | Documents in the district court record in this matter |
| FSIA | Foreign Sovereign Immunities Act |
| JA | Joint Appendix, filed October 8, 2014 |
| MÁV | Magar Államvasutak Zrt. |
| NATO-SOFA | NATO Status of Forces Agreement |
| Pls.' Br. | Brief for Appellants Rosalie Simon, et al., filed October 8, 2014 |

## JURISDICTIONAL STATEMENT

Plaintiffs' jurisdictional statement is not complete, nor is it correct.  The Foreign Sovereign Immunities Act ("FSIA") is the exclusive basis for subject matter jurisdiction over foreign sovereigns and their instrumentalities in United States courts.  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989).  Plaintiffs concede that "Hungary is a sovereign nation" (JA-23 ¶ 82),[1] and that MÁV "is an agency or instrumentality of the Republic of Hungary for purposes of the Foreign Sovereign Immunities Act" (JA-24 ¶ 85).  "Under the FSIA, a foreign sovereign and its instrumentalities are immune from suit in U.S. courts unless a specific statutory exception applies."  *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 669 (7th Cir. 2012).

The district court found that the Treaty of Peace with Hungary, Feb. 10, 1947, 61 Stat. 2065 (the "1947 Peace Treaty") is an "existing agreement" within the meaning of 28 U.S.C. § 1604, and that it provides the exclusive mechanism and forum for the resolution of claims like those asserted by Plaintiffs in this case for expropriation of property in Hungary during World War II.  JA-372.  Accordingly, the district court held that the 1947 Peace Treaty controls and precludes application

---

[1] Citations to "JA-" refer to the Joint Appendix filed with Plaintiffs-Appellants' brief, filed on October 8, 2014.  Citations to "ECF" refer to papers filed by the parties in the district court that are not in the Joint Appendix.

of any of the FSIA exceptions, *see id*., and dismissed Plaintiffs' claims against Hungary and MÁV for lack of subject matter jurisdiction.  *See* JA-379.

Plaintiffs timely appealed from the district court's May 9, 2014 Order and Memorandum Opinion dismissing their Amended Complaint by filing their Notice of Appeal on June 3, 2014.  This Court has jurisdiction to review final decisions of the district court, such as the dismissal with prejudice of a complaint.  *Ciralsky v. C.I.A.*, 355 F.3d 661, 666 (D.C. Cir. 2004); *see also Doe v. Rumsfeld*, 683 F.3d 390, 393 (D.C. Cir. 2012), *reh'g en banc denied*.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.    The first question presented is whether the district court erred in holding that the 1947 Peace Treaty is an "existing agreement" which precludes application of any FSIA exception to Hungary's and MÁV's sovereign immunity.

2.    The second question presented is whether Plaintiffs can establish the applicability of the FSIA's expropriation exception where Plaintiffs cannot establish a violation of international law because all of the alleged takings in this case by Hungary were of the property of its own nationals and where Plaintiffs have not attempted to exhaust their remedies in Hungary.

3.    The third question presented is whether Plaintiffs' claims present non-justiciable political questions where the Executive Branch has, consistent with its historical practice regarding post-war reparations, engaged in diplomatic

negotiations with Hungary resulting in the 1947 Peace Treaty which covers the precise claims brought by Plaintiffs in this case.

## STATEMENT OF THE CASE

The atrocities committed against the Jewish people during World War II have been well-documented, and it is unquestioned that Hungarian Jews were among the devastated populations.  The issue presented by this appeal, however, is not whether the injuries inflicted upon Plaintiffs and millions of others were wrongful — they undoubtedly were.  Rather, the critical question here is whether the courts of the United States may assert jurisdiction over Hungary and its national railway for alleged seizures of property from Hungarian nationals that occurred within the territorial borders of Hungary more than seventy years ago during World War II.  After analyzing both the factual allegations and the law, the district court concluded that the answer to that question is no.

### A.     Factual Background

#### 1.     The Treaty Ending World War II

Hungary and the United States, along with the other Allied Powers, signed and ratified the 1947 Peace Treaty in February 1947 to bring the hostilities of World War II to an end.  *See* JA-74-104.  Under the 1947 Peace Treaty, the Allies made Hungary responsible for the restitution of property taken during the war or compensation if restitution was not possible, both as to Hungarian nationals and as to the nationals of the United Nations.  JA-87-89 at Arts. 26 & 27.  It also provides

3

that any dispute concerning the execution or interpretation of the treaty shall be resolved exclusively through diplomatic means.  JA-93 at Art. 40

Article 26 of the 1947 Peace Treaty makes Hungary responsible for restoring property to the member States of the United Nations and the nationals thereof.  It provides: "Hungary shall restore all legal rights and interests in Hungary of the United Nations and their nationals as they existed on September 1, 1939" and requires "that all property, rights and interests passing under this Article shall be restored free of all encumbrances and charges of any kind."  JA-87 at Art. 26(1)-(2).  Article 26 further provides that Hungary "shall be responsible for the restoration to complete good order of the property returned to the United Nations nationals under paragraph 1 of this Article.  In cases where property cannot be returned [to a United Nations national] . . . he shall receive from the Hungarian Government compensation . . ."  JA-87 at Art. 26(4)(a).

Article 27 of the 1947 Peace Treaty governs the restoration of property taken during World War II from "persons under Hungarian jurisdiction," as Plaintiffs were here.[2]  Article 27 contains two parts.  First, it makes Hungary responsible for restoring such property or paying fair compensation.  Second, in the event property went unclaimed by a specified date (long since passed), Article 27 requires

---

[2] At the times relevant to this action, Plaintiffs "lived within today's Hungarian borders or in territory annexed by Hungary in 1938."  Pls.' Br. at 2.

4

Hungary to transfer "[a]ll property, rights, and interests" to representative aid organizations.  Article 27 provides in full:

> 1. Hungary undertakes that in all cases where the property, legal rights or interests in Hungary of persons under Hungarian jurisdiction have, since September 1, 1939, been the subject of measures of sequestration, confiscation or control on account of the racial origin or religion of such persons, the said property, legal rights and interests shall be restored together with their accessories or, if restoration is impossible, that fair compensation shall be made therefor.
>
> 2. All property, rights and interests in Hungary of persons, organisations or communities which, individually or as members of groups, were the object of racial, religious or other Fascist measures of persecution, and remaining heirless or unclaimed for six months after the coming into force of the present Treaty, shall be transferred by the Hungarian Government to organisations in Hungary representative of such persons, organisations or communities. The property transferred shall be used by such organisations for purposes of relief and rehabilitation of surviving members of such groups, organisations and communities in Hungary. Such transfer shall be effected within twelve months from the coming into force of the Treaty, and shall include property, rights and interests required to be restored under paragraph 1 of this Article.

JA-89 at Art. 27.

Article 40 of the 1947 Peace Treaty establishes an exclusive mechanism and forum for resolving any disputes regarding the execution or interpretation of Hungary's Treaty responsibilities.  Article 40 first requires diplomatic negotiations to try to resolve any issues.  "[A]ny dispute concerning the interpretation or execution of the Treaty, which is not settled by direct diplomatic negotiations, *shall* be referred to the Three Heads of [the Diplomatic] Mission" from the Soviet

Union, the United Kingdom, and the United States. JA-93 at Art. 40(1) (emphasis added). If a dispute remains unresolved by the Heads of the Diplomatic Missions, then the dispute *must* be resolved by a Commission consisting of a representative from each party to the dispute, who would then either select a third member or request that the Secretary General of the United Nations designate a third member. *Id*. (emphasis added). "The decision of the majority of the members of the Commission . . . *shall* be accepted by the parties as definitive and binding." JA-93 at Art. 40(2) (emphasis added).

The 1947 Peace Treaty still actively governs Hungary's international relations, including its relations with the United States and the other allied nations.[3]

## 2.     Hungary's Compliance With The Treaty

Since the signing of the 1947 Peace Treaty, disputes regarding Hungary's obligations under the Treaty have consistently been settled under Article 40's requirements. For example, in 1973, the governments of the United States and Hungary negotiated a bilateral agreement to resolve all "taken property" claims of United States nationals. *See* JA-105-115 (the "1973 Executive Agreement"). Additionally, numerous other countries including Canada, the United Kingdom,

---

[3] As of January 1, 2013, the most recent information available, the U.S. State Department lists the 1947 Peace Treaty as one of the Multilateral Treaties in Force. *See* Treaties In Force: A List of Treaties and Other International Agreements of the United States in Force on January 1, 2013, *available at* http: www.state.gov/documents/organization/218912.pdf (last visited Nov. 7, 2014).

Luxemburg, Belgium, the Netherlands, and France, followed this same mechanism and forum to resolve disputes regarding compensation owed by Hungary to their nationals. *See, e.g.*, JA-262-272 (the "U.K. Agreement"); JA-273-287 (the "Canada Agreement"); JA-288-293 (the "Belgium and Luxembourg Agreement"); JA-294-297 (the "Belgium Agreement"); JA-298-308 (the "Netherlands Agreement").[4]

In the years following the war, the Hungarian Government passed legislative enactments and remedial statutes regarding restitution in an effort to comply with Hungary's obligations under the 1947 Peace Treaty. *See* JA-37 ¶ 127. Although some compensation was paid, additional post-war efforts were derailed during the decades of Communist rule. *See* JA-39 ¶ 130. Hungary also established a foundation and transferred to it Jewish heritage that had become the property of the Hungarian State under Article 27(2).[5] *See* JA-7 ¶ 26.

In the 1990s, after the fall of the Communist regime in Hungary, the Hungarian Government resumed its efforts to comply with its obligations under the 1947 Peace Treaty. Hungary passed several Compensation Acts to provide

---

[4] The Netherlands agreement was preceded by a 1964 agreement, for which Hungary and MÁV have been unable to locate an English translation. A similar June 12, 1950 International Agreement Between Hungary and France exists, though Hungary and MÁV have been unable to locate an English translation.

[5] This foundation became the Jewish Restoration Fund during the Communist era in Hungary. JA-39 ¶ 131.

compensation to Hungarian nationals (both current and former) for losses they suffered during World War II.  *See* JA-69-70 ¶¶ 23-25.  These Compensation Acts provided compensation to the Jewish population for the wrongful taking of their property during and after World War II, as well as for personal injury during this time frame.  *Id.*

In 1993, when reviewing the constitutionality of these Compensation Acts, the Hungarian Constitutional Court issued a decision finding that Hungary had complied with its Treaty obligations under Article 27(1) through the passage of the restitution statutes.  JA-70 ¶ 27.  However, the Constitutional Court also found that Hungary had not fully complied with its obligations under Article 27(2), requiring that unclaimed Jewish heritage that had become property of the Hungarian State be transferred to a Jewish foundation.  *See* JA-70 ¶ 27.  Following this decision, the Hungarian Government established the Hungarian Jewish Heritage Public Foundation and funded it with real property, art, and money.  *See* JA-70 ¶ 28.  The Jewish Heritage Public Foundation supports Jewish culture and institutions in Hungary, and has also provided financial assistance to current and former Hungarian Jews who suffered because of the wrongs committed during World War II.  *See* JA-70 ¶ 29.  The Hungarian Government has contributed millions of dollars to the Jewish Heritage Public Foundation and other Jewish organizations.  JA-70-71 ¶¶ 29-31.  For example, in 2007 the Hungarian Government pledged $21

million to assist survivors of World War II living in Hungary and abroad.  JA-70-71 ¶ 31.

### B.    Proceedings Below

Plaintiffs filed their Amended Complaint on March 11, 2011.  *See* JA-1-61. Plaintiffs' claims in the Amended Complaint all arise from Hungary's and MÁV's alleged takings of property from them during World War II.  *See* JA-7-8 ¶ 20, JA-9 ¶ 26, JA-10-11 ¶ 32, JA-12 ¶ 39, JA-14 ¶ 43, JA-14-15 ¶ 47, JA-16 ¶ 54, JA-19 ¶ 68, JA-22 ¶ 79.  Plaintiffs were all Hungarian nationals at the time of these alleged takings.  *See* JA-5 ¶ 10, JA-6 ¶ 14, JA-8 ¶ 21, JA-9-10 ¶ 27, JA-12 ¶ 38, JA-13 ¶ 40, JA-15 ¶ 48, JA-18 ¶ 64, JA-20 ¶ 72, JA-22 ¶ 80.  As such, their claims fall under Article 27 of the 1947 Peace Treaty.

Hungary and MÁV moved to dismiss the Amended Complaint, arguing that Plaintiffs' claims should be dismissed because Hungary and MÁV are entitled to sovereign immunity under the FSIA, the claims present non-justiciable political questions, and the claims should be dismissed under the doctrine of *forum non conveniens*.  After extensive briefing, including several rounds of supplemental briefing, the district court dismissed Plaintiffs' claims for lack of subject matter jurisdiction.  JA-411-12.  The district court found that the FSIA's "Treaty Exception," found in 28 U.S.C. § 1604, applied because of the 1947 Peace Treaty's exclusive mechanism and forum for resolving disputes regarding Hungary's

obligation to provide restitution to Plaintiffs.  Moreover, although it did not decide the issue, the district court also pointed out that, even if the Treaty Exception did not apply, Plaintiffs' arguments regarding the application of the expropriation exception, 28 U.S.C. § 1605(a)(3), to Plaintiffs' claims against Hungary and MÁV suffered from significant defects.  JA-351-52 n.21.  In addition, the district court noted that the political question concerns raised by Hungary and MÁV were significant.  JA- 347-48 n.20.[6]

## SUMMARY OF THE ARGUMENT

The FSIA is the exclusive basis for subject matter jurisdiction over foreign sovereigns and their instrumentalities.  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989).  Plaintiffs concede that Hungary is a sovereign nation (JA-23 ¶ 82), and that MÁV is an agency or instrumentality of Hungary for purposes of the FSIA (JA-24 ¶ 85).  Accordingly, subject to international agreements existing at the time Congress passed the FSIA, Hungary and MÁV are presumptively "immune from the jurisdiction of the courts of the United States" unless one of the FSIA's exceptions to immunity applies.  28 U.S.C. § 1604.

---

[6] The district court did not reach Hungary and MÁV's *forum non conveniens* arguments, and therefore did not make any factual findings regarding the public and private interest factors, or the adequacy of Hungary as an alternate forum. Thus, Hungary and MÁV do not address *forum non conveniens* in this appeal.

10

As the district court found, the 1947 Peace Treaty is an existing international agreement that would prevent Plaintiffs from establishing subject matter jurisdiction even if one of the FSIA's exceptions applied to their claims. The 1947 Peace Treaty established an exclusive forum and mechanism for resolving claims regarding Hungary's obligations to provide restitution to Hungarian nationals for property taken during World War II, the very types of claims asserted by Plaintiffs in this case. Accordingly, allowing Plaintiffs' claims to proceed in a United States court would create an express conflict with the 1947 Peace Treaty's exclusive forum and claims-resolution mechanism. The 1947 Peace Treaty thus controls, and Hungary and MÁV are entitled to sovereign immunity in the United States courts with respect to Plaintiffs' claims.

Even if the Treaty Exception did not apply, this Court does not have subject matter jurisdiction over Plaintiffs' claims because they cannot show that the FSIA's expropriation exception, 28 U.S.C. §1605(a)(3), would apply to strip Hungary and MÁV of their sovereign immunity. The expropriation exception requires a showing that there has been a violation of international law, something Plaintiffs cannot show for two independent reasons: first, they have not exhausted their remedies in Hungary; second, a nation's taking of its own nationals' property is not a violation of international law. Plaintiffs also failed to allege any facts — as opposed to legal conclusions and threadbare recitals — showing that Hungary or

MÁV currently own or operate any of the allegedly taken property or its proceeds, as they must in order to establish applicability of the expropriation exception.

Finally, the political question doctrine also requires the dismissal of Plaintiffs' claims.  History shows that reparations claims following wars have always been resolved through government-to-government negotiations, not civil litigation.  Here, the United States Government and the Allied Nations entered into the 1947 Peace Treaty with Hungary to settle all of the claims arising out of World War II, including Hungary's obligations to provide reparations to its nationals. Hungary has enacted compensation schemes and established a Foundation to carry out those obligations.  Allowing Plaintiffs to proceed with their claims alleging that Hungary's compensation efforts are insufficient would require this Court to pass judgment on the actions taken by the United States Government and its Allies in entering into the 1947 Peace Treaty, as well as actions taken by the Hungarian Government to resolve reparations issues arising out of World War II.  This type of judicial second guessing of executive actions is exactly what the political question doctrine question was designed to avoid.

## ARGUMENT

### I.   THE 1947 PEACE TREATY IS AN EXISTING INTERNATIONAL AGREEMENT THAT BARS SUBJECT MATTER JURISDICTION OVER PLAINTIFFS' CLAIMS EVEN IF AN FSIA EXCEPTION TO HUNGARY'S OR MÁV'S SOVEREIGN IMMUNITY APPLIES

Section 1604 of the FSIA provides that "*subject to existing international agreements* to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."   28 U.S.C. § 1604 (the "Treaty Exception") (emphasis added).   The Supreme Court has held that the Treaty Exception applies "when international agreements 'expressly conflict[t]' with the immunity provisions of the FSIA." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 442 (1989) (*quoting* H.R. Rep. No. 94, 1487, at 17 (1976), reprinted in 1976 U.S.C.C.A.N. 6604.6616).   And, as Plaintiffs acknowledge, "any conflict with the FSIA immunity provisions, whether toward more or less immunity, is within the treaty exception." *Moore v. U.K.*, 384 F.3d 1079, 1084-85 (9th Cir. 2004); *see also* Pls.' Br. at 11 (citing *Abelesz v. MÁV*, 692 F.3d 661, 669 (7th Cir. 2012)).   Thus, "[i]f there is a conflict between the FSIA and an [existing international agreement] regarding the availability of a judicial remedy […], the agreement prevails." *Moore*, 384 F.3d at 1085.

As shown below, granting the remedies Plaintiffs seek in this action for property lost during World War II would expressly conflict with the 1947 Peace Treaty's disposition of the same property, rights, and interests. And, allowing Plaintiffs' claims to proceed in a United States court would expressly conflict with the exclusive forum and mechanism the 1947 Peace Treaty established for addressing any claims regarding the execution of Hungary's responsibilities under the Treaty for restitution of property following World War II. These express conflicts render Hungary and MÁV immune from suit for Plaintiffs' claims. Accordingly, the Treaty Exception precludes subject matter jurisdiction over Hungary and MÁV in this case.

### A.     The 1947 Peace Treaty Governs The Disposition Of The Property That Is The Subject Of This Action And Renders Hungary And MÁV Immune From Suit By Providing An Exclusive Mechanism And Forum For Disputes Concerning Treaty Obligations

Under the 1947 Peace Treaty, the victorious Allied Nations made Hungary responsible for compensating Hungarian and United Nations' nationals for property taken from them within Hungary's territorial borders during World War II. *See* JA-87-89 at Arts. 26 & 27. As the district court observed, there is no dispute that the property that is "the subject matter" of this action "was addressed in the 1947 [Peace] Treaty." JA-368.[7] But, the remedies Plaintiffs seek in this

---

[7] *Compare* JA-87-89 at Arts. 26 & 27) (addressing property "confiscate[ed] or control[led] on account of . . . racial origin or religion" from "persons under

action are inconsistent with the Treaty's disposition of that property and related rights and interests.  Plaintiffs are seeking compensation on behalf of themselves and putative class members who purportedly "have received no tangible results in terms of compensation or restitution."  Pls.' Br. at 5.  The 1947 Peace Treaty provides, however, that "[a]ll property, rights and interests" that remained "unclaimed" six months after the Treaty's effective date were to be transferred to representative aid organizations — not to Plaintiffs or members of the putative class.  *See* JA-89 at Art. 27(2).  Thus, the claims asserted in this action expressly conflict with the 1947 Peace Treaty.

The litigation of Plaintiffs' claims in this or any other court of the United States also expressly conflicts with the 1947 Peace Treaty's exclusive mechanism and forum for resolving disputes implicating Treaty obligations.  Article 40 of the 1947 Peace Treaty provides that "*any dispute* concerning the interpretation or execution of the Treaty, which is not settled by direct diplomatic negotiations, *shall* be referred to the Three Heads of Mission," and if still unresolved, to a "Commission" whose decision "*shall* be accepted by the parties as definitive and binding."  JA-93 at Art. 40 (emphasis added).  Thus, as the district court noted, the

Hungarian jurisdiction"), *with* Pls.' Br. at 2 (Plaintiffs "are Jewish Holocaust survivors who . . . lived in Hungary" and "were stripped of their valuables and other personal property").

Treaty "delineat[es] a specific and exclusive regime to resolve" disputes concerning Treaty obligations.  JA-368.

Since the 1947 Peace Treaty was enacted, disputes regarding Hungary's obligations to provide redress, including returning stolen property and paying reparations, to individuals for wrongs committed in Hungary during World War II have consistently been handled under the procedures in the Treaty.  For example, the 1973 Executive Agreement between Hungary and the United States was reached through the diplomatic negotiations required under the terms of Article 40 of the 1947 Peace Treaty.  The 1973 Executive Agreement resolved disputes regarding all "taken property" claims suffered in Hungary by U.S. nationals during World War II.  *See* JA-105-115.  Similarly, Hungary resolved disputes regarding reparations and restitution of property owned by nationals of Canada and the United Kingdom through the diplomatic negotiations mechanism established by Article 40.  *See, e.g.,* JA-262-72 (Hungary's agreement with the United Kingdom settling — among other disputes — "[a]ll obligations of the Hungarian Government and of Hungarian nationals to the United Kingdom Government and British nationals arising out of Article 26 of [the 1947 Peace Treaty.]"); JA-273-87 (Hungary's agreement with Canada settling among other disputes "obligations arising out of Articles 24 and 26 of the [1947 Peace Treaty].").  Hungary also entered into similar agreements with Luxemburg, Belgium, the Netherlands, and

France to resolve claims of those countries' nationals under the 1947 Peace Treaty

through the mechanism and forum required by Article 40.  JA-289-315.

Plaintiffs' claims in this action conflict with the exclusive regime established

under Article 40.  The 1947 Peace Treaty expressly governs restitution or

compensation for property taken from individuals or groups subjected to "racial,

religious or other Fascist measures of persecution."  JA-89 at Art. 27(2).  And,

there can be no doubt that Plaintiffs' claims in this action are based on their

arguments that Hungary and MÁV have not compensated them for their losses in

Hungary during World War II.  *See, e.g.,* JA-7-8 ¶ 20, JA-9 ¶ 26, JA-10-11 ¶ 32,

JA-12 ¶ 39, JA-14 ¶ 43, JA-14-15 ¶ 47, JA-16 ¶ 54, JA-19 ¶ 68, JA-22 ¶ 79.

Plaintiffs' claims are, therefore, expressly barred by Article 40.  As the district

court put it, "[s]ince the 1947 Treaty provides a right to be made whole for the

victims of the Hungarian Holocaust, any dispute over the adequacy of those efforts

is, by definition, a dispute over the interpretation or execution of the 1947 Treaty

such that Article 40 applies.  In such a case, Article 40 creates an exclusive,

extrajudicial remedy premised on diplomacy."  JA-371.

In other cases involving similar conflicts with treaties applicable to

sovereign defendants, courts have applied the Treaty Exception to hold that the

treaties supersede the FSIA.  For example, in *Moore*, 384 F.3d at 1087-88, the

Ninth Circuit held that the NATO Status of Forces Agreement ("NATO-SOFA")

precluded suit against the United Kingdom under the Treaty Exception. NATO-SOFA assimilates foreign service personnel "into the United States military for the purposes of claims arising out of the acts or omissions of that foreign serviceman." *Id.* at 1087. Accordingly, the treaty "ma[de] the United States the only appropriate defendant" in cases alleging misconduct by U.K. military personnel within the United States. *Id.* at 1088; *see also Greenpeace v. State of France*, 946 F. Supp. 773, 788 (C.D. Cal. 1996) (finding that a "remedy is available" under NATO-SOFA which "established an exclusive jurisdictional framework for tort claims arising out of acts allegedly committed by visiting members of the armed forces of the other country" and holding that "claims based upon the conduct of the French military occurring within the United States are governed exclusively by NATO-SOFA, and may not be adjudicated by this Court").[8]

As Plaintiffs acknowledge, these cases establish that the Treaty Exception necessarily applies where a treaty addresses how claims against a foreign sovereign

---

[8] The district court described these cases as involving a "defensive" use of the Treaty Exception because the defendants asserted the exception as grounds to provide the sovereign with immunity where the FSIA otherwise might not. JA-353-64. The district court analyzed these applications of the Treaty Exception using the same standard applicable to "offensive" uses (where plaintiffs assert the exception to deprive sovereigns of immunity) – it looked to the treaties to determine whether they did in fact conflict with the FSIA regarding the issue of immunity. The district court never held or suggested, as Plaintiffs contend, that the Treaty Exception should be given a "different reading or application" when used defensively rather than offensively. Pls.' Br. at 17.

are to be handled.  Pls.' Br. at 18-19.  And that is just what the 1947 Peace Treaty does.  It expressly governs restitution and compensation for the property that is the subject matter of this suit.  It transferred property, rights, and interests that were not claimed within the 1947 Peace Treaty's time limitations to representative aid organizations, rather than to Plaintiffs or putative class members.  And it created an exclusive, non-judicial mechanism and forum to resolve any disputes concerning the interpretation or execution of the Treaty.[9]

In view of these express conflicts, the FSIA's Treaty Exception precludes Plaintiffs from proceeding in a United States court.  Plaintiffs' claims were therefore properly dismissed.[10]  28 U.S.C. § 1604; *Moore*, 384 F.3d at 1085.

### B.     Plaintiffs Cannot Overcome The Express Conflicts Between This Action And The 1947 Peace Treaty

Plaintiffs' arguments that asserting jurisdiction over Hungary and MÁV would not conflict with the 1947 Peace Treaty are unavailing.  Plaintiffs

---

[9] Plaintiffs attempt to distinguish *Moore* on the ground that the 1947 Peace Treaty here is supposedly "silent regarding claims of, or claimants to, deprived property." Pls.' Br. at 17.  But the Treaty is not silent on these issues.  It expressly provides that property not previously claimed shall be transferred to aid organizations rather than to individual claimants, and it provides for an exclusive, non-judicial forum for the resolution of "any dispute" (*i.e.*, claim).

[10] For the first time in this appeal, Plaintiffs argue that the alleged takings giving rise to their claims also violated the Treaty of Trianon. Pls.' Br. at 28-29.  But nothing in the Treaty of Trianon, signed in 1920, changes the fact that Plaintiffs' claims are entirely within the scope of disputes covered by the 1947 Peace Treaty and its Article 40 mechanism for resolution, and are therefore barred from litigation in United States courts.

principally contend that there is no express conflict when a treaty "only sets forth rules of substantive conduct and states that compensation will be paid for certain wrongs."  Pls.' Br. at 13.  The cases they cite for this proposition all concern attempts to *deprive* sovereign defendants of immunity on the basis of such treaty provisions.  *See id.* at 12-15.  None of those cases addresses how treaty-based compensation schemes affect a sovereign's defensive assertion of immunity for conduct within the scope of the treaty, as in this case.

But there is a more fundamental problem with Plaintiffs' argument.  The 1947 Peace Treaty does not "only" provide for compensation for certain conduct; it also provides that all property, rights and interests not previously claimed must be transferred to representative aid organizations (*see* JA-89 at Art. 27(2)) — a provision that Plaintiffs' brief fails to mention.  By asserting claims to the same property, rights, and interests that the 1947 Peace Treaty transfers to other parties, this action expressly conflicts with the Treaty.  Moreover, the 1947 Peace Treaty established an exclusive, non-judicial mechanism and forum to resolve disputes concerning the Treaty's execution or interpretation.  This case presents such a dispute.[11]

---

[11] All the cases cited by Plaintiffs that held that the Treaty Exception did not apply involved treaties that spoke only to the substance of the claims raised; none of these treaties discussed the forum or mechanism for resolving an alleged treaty violation like the 1947 Peace Treaty does.  *See, e.g., Amerada Hess*, 488 U.S. at 442 (finding that the Treaty Exception did not apply where the treaties at issue

Plaintiffs claim there is no conflict because the 1947 Peace Treaty does not address Hungary's or MÁV's amenability to suit in United States courts. *See* Pls.' Br. at 19-22. But, in fact, it expressly addresses that issue by providing for an exclusive forum *other* than the United States courts to resolve "any dispute." *See* JA-93 at Art. 40. Plaintiffs apparently read the term "any dispute" in Article 40 to exclude disputes involving the interests of private claimants. That reading is contrary to the provision's text, purpose, and history.[12] Moreover, whatever its merits, Plaintiffs' interpretation of the 1947 Peace Treaty is just that — an

"only set forth substantive rules of conduct" and did not address available remedies or forums); *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 451-52 (D.C. Cir. 1990) (finding that the Treaty of Amity does not address the right to bring claims in United States courts, but only "sets forth .[.]. substantive provisions, and hence does not pose a bar to application of FSIA"); *Princz v. Fed. Republic of Germany,* 26 F.3d 1166, 1175 (D.C. Cir. 1994) (rejecting the plaintiff's argument that the Hague Convention conflicts with the FSIA and serves as basis for subject matter jurisdiction because the Hague Convention only sets forth rules of conduct and does not address the availability of remedies in United States courts); *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 720 (9th Cir. 1992) (holding that it could not, "consistently with *Amerada Hess*, accept the [plaintiffs'] argument that the U.N. Charter expressly conflicts with the FSIA when the Charter does not even discuss compensation or individual remedies"); *Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 246-47 (2d Cir. 1996) (finding that Treaty Exception does not apply because the UN Charter only addresses the conduct at issue in the plaintiff's claims but there are no provisions speaking to the availability of remedies in United States courts).

[12] As to text: "any dispute" means all disputes. As to purpose: the Commission's decisions could not be "definitive and binding" if a different tribunal could render an inconsistent award to the same property. As to history: The Article 40 procedure has repeatedly been used to secure compensation to private parties, including in the 1973 Executive Agreement.

interpretation of the 1947 Peace Treaty.    And, like any dispute over the interpretation of the 1947 Peace Treaty, it must be submitted to the diplomatic forum established by Article 40, not a United States court.

For similar reasons, Plaintiffs are incorrect when they argue there is no conflict because the 1947 Peace Treaty does not create a private cause of action. Pls.' Br. at 20-21.  The absence of a private right of action in the 1947 Peace Treaty does not mean that private individuals can assert claims to the same property and rights governed by the Treaty outside of Article 40's exclusive forum. It merely reflects the Treaty's preference for diplomatic rather than judicial resolution of disputes.  *See Burger-Fischer v. Degussa A.G.*, 65 F. Supp. 2d 248, 279 (D.N.J. 1999) (stating, in a discussion of the 1947 Peace Treaty and other post-war treaties, that "from the outset, negotiations concerning reparation claims, both with the western and eastern bloc nations, included within the term 'reparations' claims of individuals . . .").[13]  To the extent Plaintiffs construe the 1947 Peace Treaty differently, they have, at most, raised a disputed question of the

---

[13] The mechanism for resolving Plaintiffs' claims found in Article 40 of the 1947 Peace Treaty is also consistent with broader U.S. and international policy for resolving disputes and restoring peace in the aftermath of war.  JA-188-204.

interpretation of the 1947 Peace Treaty that must be decided under Article 40's diplomatic forum, not a United States court.[14]

The Seventh Circuit overlooked these points when it concluded in *Abelesz* that the FSIA's Treaty Exception did not apply to claims similar to those alleged here. *Abelesz*, 692 F.3d at 695-96; Pls.' Br. at 19-21. Like Plaintiffs argue here, the Seventh Circuit stated that the 1947 Peace Treaty "said nothing about the rights and responsibilities of the people from whom Hungary expropriated property," and therefore does not conflict with United States jurisdiction over Plaintiffs' claims.[15] *Abelesz*, 692 F.3d at 695-96.

---

[14] *Amerada Hess* and *McKesson*, on which Plaintiffs rely, Pls.' Br. at 20, are inapposite. Where, as in those cases, plaintiffs assert the Treaty Exception to deprive a sovereign defendant of immunity, the absence of a private right of action may indeed help show why the exception is inapplicable. But where, as here, the Treaty Exception is asserted defensively to establish immunity, the absence of a private right of action does not vitiate the exception. If anything, it shows that the Treaty did not contemplate private suits against the sovereign party.

[15] The Seventh Circuit also held in *Abelesz* that the plaintiffs were required to show they had exhausted their remedies in Hungary in order to establish a taking in violation of international law under the FSIA's Expropriation Exception and remanded the case to the district court for further proceedings on that issue. *Abelesz*, 692 F.3d at 695. On remand, the district court dismissed the case because the plaintiffs could not show they had exhausted their civil litigation remedies in Hungary, nor had they established a legally compelling excuse for failing to exhaust. *Fischer v. MÁV*, Case No. 10 C 868 (N.D. Ill. Aug. 20, 2013, Dkt. No. 115) (order dismissing case without prejudice). The plaintiffs' appeal of the district court's dismissal is pending before the Seventh Circuit.

As the district court explained, the Seventh Circuit's decision regarding the applicability of the Treaty Exception was predicated on two fundamental errors. JA-368-72. First, the *Abelesz* Court read Article 27 of the 1947 Peace Treaty to cover only Hungary's obligations and not the claims of individuals. *Abelesz*, 692 F.3d at 695. The clear language of Article 27, however, specifically provides for restitution or compensation to "the people from whom Hungary expropriated property," and mandates that unclaimed property is to be transferred to aid organizations. JA-89 at Art. 27; *see also* JA-368-69.

The Seventh Circuit's second fundamental error related to its unduly restrictive reading of the exclusive forum and dispute resolution mechanism established by Article 40 of the 1947 Peace Treaty. As the district court held, while primarily a peace treaty, the 1947 Peace Treaty contained numerous provisions related to the rights and responsibilities of the allied nations, the Hungary defendants, and the people and armies under their control. JA-370-80. All of these provisions are subject to resolution by Article 40's exclusive forum and dispute resolution mechanisms, and by signing the 1947 Peace Treaty, Hungary not only took on the treaty obligations — for which it otherwise would not have been liable in United States courts due to the general principles of

sovereign immunity — but also subjected itself to the exclusive executive branch mechanism for resolving claims arising from these obligations.  *Id.*[16]

Finally, Plaintiffs mischaracterize the district court's discussion of the 1973 Executive Agreement.  Even if, as Plaintiffs argue (Pls.' Br. at 22-26), the 1973 Executive Agreement addresses only the claims of those who were United States nationals at the time of the takings — a category which does not include Plaintiffs — that does not undermine the agreement's significance.  Rather, the discussion of the 1973 Executive Agreement is an illustration of how the Article 40 mechanism works to resolve claims like the ones Plaintiffs have brought in this case.  The United States, on behalf of its citizens who were claiming Hungary had not met its obligations under Article 26, entered into state-to-state negotiations with Hungary.  An agreement was reached, and so resort to the additional provisions of Article 40 was not necessary.  Numerous other disputes regarding Hungary's obligations under the 1947 Peace Treaty — to provide redress, including returning stolen

---

[16] The Seventh Circuit also failed to take notice of the long history of how individual private claims arising out of a war are typically resolved.  The types of war-related claims raised by Plaintiffs in this case have always been handled by government-to-government negotiations and are not a proper subject of individual litigation.  *See, e.g.*, *Burger-Fischer*, 65 F. Supp. 2d at 282 ("In effect, plaintiffs are inviting this court to try its hand at refashioning the reparations agreements which the United States and other World War II combatants . . . forged in the crucible of a devastated post-war Europe and in the crucible of the Cold War. . . . [T]his is a task which the court does not have the judicial power to perform."); *see also*, Section III.B. *infra*.

property and paying reparations to individuals for wrongs committed during World War II — have been handled under these same procedures contained in Article 40 of the 1947 Peace Treaty.  *See supra* at 16-17 (discussing agreements Hungary reached with Canada, the United Kingdom, Luxemburg, Belgium, the Netherlands, and France).

## II.  HUNGARY AND MÁV ARE IMMUNE FROM SUIT IN THE UNITED STATES BECAUSE PLAINTIFFS CANNOT SHOW THAT THE FSIA'S EXPROPRIATION EXCEPTION APPLIES TO THEIR CLAIMS

Even if the 1947 Peace Treaty did not preclude this action, the district court would have no jurisdiction over Plaintiffs' claims because Plaintiffs have failed to establish any exception to FSIA immunity.  The only FSIA exception to Hungary's and MÁV's sovereign immunity asserted by Plaintiffs in this case is the expropriation exception, found under 28 U.S.C. § 1605(a)(3).  Section 1605(a)(3) provides that a foreign state and its instrumentalities will not be immune where:

> rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

The district court explained that, even if the Treaty Exception did not apply, "the Plaintiffs' attempt to fit their claims against the Hungary Defendants into the

expropriation exception to the FSIA suffers from significant defects," not only because of a failure to show any taking in violation of international law, but also because of their failure to plausibly plead the facts required to establish the exception's applicability to their claims.  *See* JA-351 n.21.

### A.     Plaintiffs Cannot Show Any Taking Of Property In Violation Of International Law

For the expropriation exception to apply, Plaintiffs must show that rights in property that were taken "in violation of international law." *Nemariam v. Fed. Democratic Republic of Ethiopia*, 491 F.3d 470, 475 (D.C. Cir. 2007), *reh'g denied*.  Here, Plaintiffs cannot show that any violation of international law occurred because they have not shown that they have exhausted their Hungarian remedies and, independently, because a sovereign state's taking from its own nationals does not violate international law.

### 1.     Plaintiffs Have Not Shown That They Have Exhausted Their Hungarian Remedies

To establish a violation of international law, Plaintiffs must first show that they have "pursued and exhausted domestic remedies in the foreign state that is alleged to have caused the injury." *Millicom Int'l Cellular v. Republic of Costa Rica*, 995 F. Supp. 14, 23 (D.D.C. 1998); *see also Abelesz*, 692 F.3d at 697 (plaintiffs failed to show their claims against MÁV fell within the expropriation exception because, among other things, "plaintiffs have not exhausted their

Hungarian remedies"); Restatement (Third) of the Foreign Relations Law of the United States § 713 cmt. f ("Under international law, ordinarily a state is not required to consider a claim by another state for an injury to its national until that person has exhausted domestic remedies . . . [listing exceptions.]"); *cf. Republic of Austria v. Altmann*, 541 U.S. 677, 714 (2004) (Breyer, J., *concurring*) ("A plaintiff who chooses to litigate in this country in disregard of the postdeprivation remedies in the 'expropriating' state may have trouble showing a 'tak[ing] in violation of international law.'") (alteration in original); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004) (consideration of whether a claimant "must have exhausted any remedies available in the domestic legal system, and perhaps in other forums such as international claims tribunals" before asserting a claim in United States courts should be undertaken in appropriate cases). This exhaustion requirement arises not from the text of the FSIA, but from international law. *See Abelesz*, 692 F.3d at 679. And since Plaintiffs must establish a violation of international law to come within the FSIA's expropriation exception to sovereign immunity, they must plead exhaustion of domestic remedies.

Nowhere in the Amended Complaint or in their brief do Plaintiffs allege that they made any attempts to exhaust their remedies in Hungary.[17] Instead, Plaintiffs

---

[17] As other courts have recognized, Hungary has enacted laws to provide compensation to individuals like Plaintiffs. *See, e.g., de Csepel v. Republic of Hungary*, 808 F. Supp. 2d 113, 130-31 (D.D.C. 2011) (recognizing that Hungary's

claim that they do not have to show exhaustion because "[t]his Circuit has stated that there is no requirement to exhaust domestic remedies." *See* Pls.' Br. at 31 (citing *Agudas Chasidei Chabad v. Russian Fed'n*, 528 F.3d 934, 948 (D.C. Cir. 2008) ("*Chabad*")). Plaintiffs' argument, however, is based on a misreading of *Chabad*. The district court in *Chabad* declined to impose an exhaustion requirement. 466 F. Supp. 2d 6, 21 (D.D.C. Cir. 2006). On appeal, however, this Court only decided that the FSIA has had no *statutory* exhaustion requirement. *Chabad*, 528 F.3d at 949. This Court "[a]ssume[d] that an exhaustion requirement [does] exist[]" under international law, but held that the remedy that the defendant had identified was "plainly inadequate," so the exhaustion requirement would not have affected the outcome of the case. *Id.* at 948-49.[18]

The only Circuit Court to analyze whether international law includes a prudential exhaustion requirement is the Seventh Circuit. In *Abelesz*, the Seventh Circuit held that exhaustion of local remedies is required before a taking can be found to violate international law. *Abelesz*, 692 F.3d at 679. The Seventh Circuit

---

1992 Compensation Act "allow[ed] for compensation for World-War II-era claims"); *see also* JA-69-70 ¶¶ 24-25.

[18] The only other case that Plaintiffs cited to support their argument that there is no exhaustion requirement with respect to the expropriation exceptions is *Cassirer v. Kingdom of Spain*, 616 F.3d 1019, 1034 (9th Cir. 2010). However, *Cassirer*, like *Chabad*, only found that there is no *statutory* exhaustion requirement in the FSIA. *Id.* *Cassirer* did not decide the issue of whether there is a prudential exhaustion requirement under international law. *Id.* at 1022.

explained that: "the requirement that domestic remedies for expropriation be exhausted before international proceedings may be instituted is a well-established rule of customary international law that the United States itself has invoked." *Id.* (internal quotations omitted). "This rule is based on the idea that the state where the alleged violation occurred should have an opportunity to redress it by its own means, within the framework of its own legal system." *Id.* at 680. When the United States is sued in foreign courts, it has been the beneficiary of the domestic exhaustion rule. *Id.* at 680-81. "Comity requires that the United States be prepared to reciprocate." *Id.* at 680.

The Seventh Circuit further explained that the plaintiffs in that case (whose claims are similar to the claims of Plaintiffs in this case) were seeking to recover billions of dollars in damages for events that occurred in Hungary many decades earlier and that "[w]e should consider how the United States would react if a foreign court ordered the U.S. Treasury or the Federal Reserve Bank to pay a group of plaintiffs 40 percent of U.S. annual gross domestic product . . . based on events that happened generations ago in the United States itself, without any effort to secure just compensation through U.S. courts." *See id.* at 682. And, importantly, "[i]f U.S. courts are ready to exercise jurisdiction to right wrongs all over the world, including those of past generations, we should not complain if

other countries' courts decide to do the same." *Id.*[19]

Accordingly, because Plaintiffs have not plead that they made any attempts to exhaust their remedies in Hungary, they cannot show a taking of property in violation of international law. Without an international law violation, Plaintiffs cannot show that 28 U.S.C. § 1605(a)(3) provides an exception to Hungary's and MÁV's sovereign immunity.

### 2.    A Nation's Expropriation Of Property From Its Own Nationals Does Not Violate International Law

There is a second, independent reason why Plaintiffs cannot show an international law violation. It is well-established that the "[e]xpropriation by a sovereign state of the property of its own nationals does not implicate settled principles of international law." *Rong v. Liaoning Provincial Gov't*, 362 F. Supp. 2d 83, 101 (D.D.C. 2005) (quoting *Chuidian v. Philippine Nat'l Bank*, 912 F.2d

---

[19] The foreign policy concerns expressed by the United States Supreme Court in upholding the dismissal of plaintiff's claims in *Kiobel v. Royal Dutch Petroleum Co.* also support the imposition of an exhaustion requirement. *See Kiobel*, 133 S. Ct. 1659, 1664-65 (2013) ("the potential [foreign policy] implications . . . of recognizing . . . causes [under the ATS] should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs"; "[s]ince many attempts by federal courts to craft remedies for the violation of new norms of international law would raise risks of adverse foreign policy consequences, they should be undertaken, if at all, with great caution") (*quoting Sosa*, 542 U.S. at 727-28 (2004)). In *Kiobel*, like here, all of the plaintiffs were foreign nationals at the time their claims arose; all the defendants, like Hungary and MÁV in this case, were foreign; and all of the alleged misconduct took place abroad with no connections to the United States.

1095, 1105 (9th Cir. 1990)).  "[C]onfiscations by a state of the property of its own

nationals, no matter how flagrant and regardless of whether compensation has been

provided, do not constitute violations of international law."  *Id.* at 102 (quoting *F.*

*Palicio y Compania, S.A. v. Brush*, 256 F. Supp. 481, 487 (S.D.N.Y. 1966)); *see*

*also Altmann v. Fed. Republic of Austria*, 317 F.3d 954, 968 (9th Cir. 2002)

(holding that under the expropriation exception to the FSIA, "the plaintiff cannot

be a citizen of the defendant county at the time of the expropriation, because

'[e]xpropriation by a sovereign state of the property of its own nationals does not

implicate settled principles of international law'") (quoting *Siderman de Blake v.*

*Republic of Argentina*, 965 F.2d 699, 711 (9th Cir. 1992)); *but see Abelesz*, 692

F.3d at 674-75 (finding that the domestic takings rule is well-established under

international law and "has been recognized and applied in many decisions in U.S.

courts," but declining to apply it).

All of Plaintiffs were Hungarian nationals at the time of the events in

question.[20]  Although Plaintiffs allege that they are now citizens of the United

States, Canada, Israel, and Australia, they bring suit against defendants for the

alleged expropriation and/or nationalization of property owned by "Hungarian

Jewish victims."  JA-4 ¶ 3.  The Amended Complaint clearly alleges that Hungary

---

[20] *See* JA-5 ¶ 10, JA-6 ¶ 14, JA-8 ¶ 21, JA-9 ¶ 27, JA-12 ¶ 38, JA-13 ¶ 40, JA-15 ¶ 48, JA-18 ¶ 64, JA-20 ¶ 72, JA-22 ¶ 80.

and MÁV "orchestrated, collaborated and participated in the confiscation of the personal possessions of their *Hungarian Jewish victims. Id.* (emphasis added); *see also* JA-23 ¶ 82 (complaining of Hungary's acts against "*its own* Jewish Population.") (emphasis added).   Thus, because Plaintiffs were all Hungarian nationals at the time of the alleged takings, there was no violation of "settled principles of international law." *Rong*, 362 F. Supp. 2d at 101.  Therefore, because Plaintiffs cannot show a violation of international law as required by 28 U.S.C. § 1605(a)(3), the FSIA expropriation exception does not apply to deprive Hungary and MÁV of their sovereign immunity.[21]

In *Abelesz*, the Seventh Circuit declined to apply the domestic takings exception to claims similar to those asserted here even though it recognized it was a long-standing rule under international law, because it thought that "the relationship between genocide and expropriation in the Hungarian Holocaust take these cases outside the domestic takings rule."  692 F.3d at 675.  The Seventh Circuit, however, ignored the fact that the FSIA's expropriation exception only

---

[21] Plaintiffs claimed in the district court that certain unnamed class members may not have been Hungarian nationals at the time of the alleged takings. *See* ECF-24 at 3, 16-17.  When determining whether a court has jurisdiction over a putative class action, however, the court only considers the citizenship of the named plaintiffs.  *See Supreme Tribe of Ben Hur v. Cauble*, 255 U.S. 356, 365-66 (1921); *see also Nat'l Bank of Wash. v. Mallery*, 669 F. Supp. 22, 25 (D.D.C. 1987) ("[T]he citizenship of class members who are not designated 'representatives' is irrelevant to the jurisdictional inquiry.") (internal citation omitted).

deals with property claims; the FSIA has separate sections that deal with torts and other claims.  *See, e.g.,* 28 U.S.C. § 1605(5) (torts committed in the U.S.); 28 U.S.C. § 1605(a) (terrorism-related claims).  Thus, the Seventh Circuit erred in not applying the domestic takings rule to the *Abelesz* plaintiffs' claims under the expropriation exception.

The district court in *de Csepel v. Republic of Hungary* similarly erred by concluding that a World War II-era seizure of artworks from a Hungarian Jewish family was a violation of international law because "Hungary . . . had *de facto* stripped [the family] and all Hungarian Jews of their citizenship rights."  808 F. Supp. 2d 113, 129 (D.D.C. 2011).  The *Abelesz* court perceived the flaw in this reasoning:

> We are not persuaded by plaintiffs' argument that the domestic takings rule operates to bar the claims of only citizens and thus should not apply in this case on the theory that plaintiffs were not citizens of Hungary "in any meaningful sense" at the time of expropriation.  Most courts agree that the relevant inquiry for purposes of the domestic takings rule is whether plaintiffs are *nationals* of the expropriating state.

*Abelesz*, 692 F.3d at 676 n.6.  "International law, as its name suggests, deals with relations between sovereign states, not between states and individuals."  *de Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385, 1396 (5th Cir. 1985).  Accordingly, "[i]njuries to individuals have been cognizable only where they implicate two or more different nations: if one state injures the national of another

state, then this can give rise to a violation of international law since the individual's injury is viewed as an injury to his state." *Id.* But, when "a nation injures only its own nationals . . . no other state's interest is involved." *Id.*

Because all of Hungary's and MÁV's alleged takings in this case involved the property of Hungarian nationals, those takings do not constitute a violation of international law as is required for application of the expropriation exception. Therefore, Plaintiffs cannot establish an exception to Hungary's and MÁV's sovereign immunity, and their Amended Complaint should be dismissed.

**B.     Plaintiffs Have Not Pled Any Factual Allegations That Would Plausibly Establish That The Expropriation Exception Deprives Hungary Or MÁV Of Their Immunity In This Case**

Even if Plaintiffs could show a violation of international law, their claims still would not come within Section 1605(a)(3)'s expropriation exception. In order to show that 28 U.S.C. § 1605(a)(3) applies to deprive Hungary or MÁV of their sovereign immunity, Plaintiffs must plausibly allege that property taken in violation of international law, or any property exchanged for such property, is still in Hungary's or MÁV's possession. *See* 28 U.S.C. § 1605(a)(3). The factual allegations in Plaintiffs' Amended Complaint fall far short of meeting this requirement.

Nowhere in their Amended Complaint do Plaintiffs make any factual allegations regarding what property remains in Hungary's or MÁV's possession or,

if exchanged for other property, explain what form the property is in (e.g., bank accounts, real property, etc.).  Instead, the Amended Complaint only makes the conclusory allegation — regurgitating the statutory language — that Hungary "maintains property in, the United States, that has been exchanged for the property it stole from the plaintiffs herein" and "that property is present in the United States in connection with commercial activity carried on by Hungary within the United States," *see* JA-23 ¶ 83; and that "MÁV owns and/or operates property and property exchanged for property that it stole from Hungarian Jewish deportees." JA-24 ¶ 85.  These are nothing more than "bald assertions" and Plaintiffs have "failed to set forth any facts" in their support.  *See Crist v. Republic of Turkey*, 995 F. Supp. 5, 11 (D.D.C. 1998) (plaintiffs' "mere allegations" that property is connected to "unidentified" commercial activity without any additional facts is "not sufficient to satisfy the jurisdictional requirements under the FSIA"); *Freund v. Republic of France*, 592 F. Supp. 2d 540, 559-60 (S.D.N.Y. 2008) (finding that plaintiffs' conclusory allegations that defendant took property sixty years ago did not justify inference that defendant still owned or operated such property today).  Moreover, when the "factual" allegations in the Amended Complaint are analyzed, it is clear that Plaintiffs have not plausibly shown that any stolen property, or property exchanged for such property, remains in Hungary's or MÁV's possession today some seventy years later.

Plaintiffs admit in their Amended Complaint that allegedly taken property was "transferred" to the "Nazi Government during World War II."  JA-40 ¶ 136. Plaintiffs also allege that other such property was sold by Hungary and "funds received by Hungary and MÁV from looted Hungarian Jewish property, art, and lands were used for, commingled with, and exchanged for bank accounts, government operating funds, and other property used by Hungary."  *See* Pls.' Br. at 30-31; JA-28-29 ¶¶ 98-100.  And, Plaintiffs concede that comingled funds were used to finance government operations through the end of the war and beyond.  *See* Pls.' Br. at 3.

As the district court noted, "[t]he expropriation exception has been applied when certain property is identifiable and in the possession of the defendant sovereign."  JA-352 n.21.  Given the Plaintiffs' factual allegations, it is simply not plausible that either Hungary or MÁV still possesses the property in question, or property exchanged for such property, or that such property is even identifiable.

Moreover, to the extent the allegedly taken property remained unclaimed following the entry into force of the 1947 Peace Treaty, Hungary was required under Article 27 to turn such property over to appropriate relief organizations.  JA-89 at Art. 27(2).  Plaintiffs concede that Hungary established a foundation and turned valuable property over to it.  JA-70 ¶ 26.  The Hungarian Government also later established the Hungarian Jewish Heritage Public Foundation and funded it

with real property, art and money.  *See* JA-70-71 ¶¶ 28-29, 31.  Thus, as summed up by the district court, there is "a significant issue with the plaintiffs' contention that the Hungarian state or its instrumentalities continue to retain property or property exchanged for property expropriated by the Nazi-era Hungarian state." JA-351 n.21.

Indeed, as noted by another United States court, "[i]n the fall and winter of 1944-45, as the prospect of Germany's defeat loomed larger, the Hungarian Government, at the direction of the Nazis, loaded . . . Jewish property onto a train bound for Germany."  *Rosner v. United States*, 231 F. Supp. 2d 1202, 1204-05 (S.D. Fla. 2002).  "The lengthy train," known as the "Gold Train," "made its way from Hungary into Austria, but never made it to German territory" because it was intercepted by the United States Army.  *Id.*  Given this historical fact, and Plaintiffs' bare bones factual allegations and admissions, it is just as likely that the allegedly taken property was disposed of during the many tumultuous periods in Hungary's history since World War II and that it is not still in Hungary's or MÁV's possession.[22]  And there is no dispute that the statutory language of the

---

[22] The district court also observed that Plaintiffs' "contention that the co-mingling of funds taints all property maintained by the Hungary Defendants is highly attenuated and therefore weak support for application of the Expropriation Exception" because, if this were enough, it "would tend to defeat any effort at proving the presence of 'property exchanged for [expropriated] property.'"  JA-351 n.21 (citing cases that have rejected such co-mingling theories).

expropriation exception uses the present tense and thus requires that the property or the exchanged for property currently be in the possession of Hungary or MÁV. *See* 28 U.S.C. §1605(a)(3).

Given that the historical record and Plaintiffs' allegations show that it is just as plausible that the property taken from Plaintiffs during World War II is no longer in Hungary's or MÁV's possession, as Plaintifs' claim that it is, Plaintiffs have not shown that the expropriation exception divests Hungary or MÁV of their sovereign immunity with respect to Plaintiffs claims.[23] *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2004) (allegations in a complaint must "raise a right to relief above the speculative level"); *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("[w]here a complaint pleads facts that are merely consistent with a defendants' liability, it stops short of the line between possibility and plausibility of entitlement to relief") (internal quotations and citations omitted).

---

[23] Plaintiffs' arguments regarding the application of the expropriation exception to Hungary must also fail because there is not a single factual allegation in the Amended Complaint about any commercial activity that is carried on by Hungary in the United States. As noted above, the Amended Complaint only repeats the statutory language in alleging that Hungary "maintains property in the United States" and that the "property is present in the United States in connection with commercial activity carried on by Hungary within the United States." *See* JA-23 ¶ 83. Plaintiffs cannot use their allegations regarding MÁV's purported commercial activity in the United States to apply the expropriation exception to Hungary. *See Chettri v. Nepal Bangladesh Bank, Ltd.*, No. 10 Civ. 8470, 2014 WL 4354668, at *17 (S.D.N.Y. Sept. 2, 2014) (the commercial activity prong of the expropriation exception that applies to an instrumentality of the foreign state does not apply to the foreign state itself).

**C.    Plaintiffs Cannot Pursue Their Non-Property Claims Under The FSIA's Expropriation Exception**

Even assuming that Plaintiffs could show that jurisdiction is proper with respect to their property claims under 28 U.S.C. §1605(a)(3), their non-property claims must be dismissed. *See Abelesz*, 692 F.3d at 696-97 (rejecting plaintiffs' argument that they could bring any claims they have against the sovereign defendant once subject-matter jurisdiction is established under the FSIA for one claim, and finding that "the expropriation exception in the FSIA authorizes jurisdiction only for claims for the taking of property in violation of international law"). While Plaintiffs attempt to transform genocide, which is a tort – and must therefore be pursued under the tort exception to the FSIA (28 U.S.C. § 1605(a)(5) – into a taking to avoid dismissal, the FSIA's tort exception requires that the tort occur *in the United States* for the exception to apply. *See* 28 U.S.C. § 1605(a)(5) (addressing claims "for personal injury or death, or damage to or loss of property, occurring in the United States"); *see Cicippio v. Islamic Republic of Iran*, 30 F.3d 164, 169 (D.C. Cir. 1994) (holding that the "noncommercial tort" exception to FSIA did not apply where injuries complained of took place entirely in Lebanon). Any personal injury or wrongful death alleged by Plaintiffs occurred entirely in Europe during World War II. *See, e.g.*, JA-25-26 ¶¶ 90-92. And, as observed by the Second Circuit, the Courts of Appeals have consistently rejected attempts "to shoehorn a claim properly brought under one [FSIA] exception into another." *In*

40

*re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 89 (2d Cir. 2008). Rather, the

FSIA's exceptions to immunity must be "narrowly construed." *See Haven v.*

*Polska*, 215 F.3d 727, 731 (7th Cir. 2000); *Sampson v. Fed. Republic of Germany*,

250 F.3d 1145, 1156 (7th Cir. 2001). For this reason, FSIA immunity is evaluated

on a claim-by-claim basis. *See* 28 U.S.C. § 1606 ("As to any claim for relief with

respect to which a foreign state is not entitled to immunity . . . the foreign state

shall be liable in the same manner and to the same extent as a private individual

under like circumstances."); *see also Abelesz*, 692 F.3d 661, 697 ("The analysis

under the expropriation exception must be on a claim-by-claim basis."); *Siderman*

*de Blake*, 965 F.2d at 706 ("As a threshold matter . . . a court adjudicating a claim

against a foreign state must determine whether the FSIA provides subject matter

jurisdiction over the claim."); *Dar-el Bina Eng'g & Contracting Co. v. Republic of*

*Iraq*, 79 F. Supp. 2d 374, 386 (S.D.N.Y. 2000) (noting that the text of the FSIA

"strongly suggests that Congress meant to confer jurisdiction on the district courts

only with respect to specific claims as to which immunity was lacking").

Since most of the counts in the Amended Complaint (and the allegations

therein) do not fit within the expropriation exception to FSIA immunity because

they concern personal injuries or other non-property based torts,[24] those claims

---

[24] *See, e.g.,* JA-50 Count III (Breach of Fiduciary and Special Duties Imposed on Common Carriers), Count IV (False Imprisonment); JA-51 Count V (Torture); Count VI (Assault and Battery); JA-52 Count VII (Wrongful Death), Count VIII

must be dismissed even if the expropriation exception were otherwise found to apply to Plaintiffs' property claims.

## III. PLAINTIFFS' CLAIMS PRESENT NON-JUSTICIABLE POLITICAL QUESTIONS

Even putting aside Hungary's and MÁV's sovereign immunity, Plaintiffs' claims should be dismissed because they present non-justiciable political questions. The issue of compensation for wartime losses that Plaintiffs raise has been textually committed to political departments by the 1947 Peace Treaty. The courts should adhere to the Executive Branch's determination of the terms for ending the war against Hungary and restoring diplomatic relations. A contrary judicial determination could embarrass or undermine executive authority and impair the United States' ability to conduct foreign diplomacy.

Indeed, war reparations claims like those raised by Plaintiffs in this case have historically been resolved through international government-to-government negotiations, not through civil litigation.[25] More specifically, claims relating to

_____

(Survival), Count IX (Intentional Infliction of Emotional Distress); JA-53 Count X (Negligent Infliction of Emotional Distress), Count XI (Recklessness), Count XII (Negligence); JA-54 Count XIII (Conspiracy), Count XIV (Aiding and Abetting); JA-56-57 Count XVII (Alien Tort Claims Act Violations).

[25] Plaintiffs seek to distinguish this case from previous attempts to have United States courts pass judgment on the actions of sovereign entities involved in the Holocaust by claiming that Hungary and MÁV have "never been brought before the bar of justice," and casting their claims as an effort to "to remedy these injustices." JA-4 ¶ 4. This argument ignores the numerous political decisions that

post-World War II reparations *by Hungary* have already been addressed through international negotiations between Hungary and the United States and its allies following World War II, resulting in the 1947 Peace Treaty. And, since the 1947 Peace Treaty was enacted, Hungary has continued to negotiate agreements regarding reparation claims covered by the 1947 Peace Treaty, including among others, the 1973 Executive Agreement between Hungary and the United States. As a result, Plaintiffs' claims are rendered non-justiciable under the political question doctrine.

### A.  The United States Executive Branch Has Addressed Hungary's Holocaust-Related Obligations In The 1947 Peace Treaty And The 1973 Executive Agreement

In *Baker v. Carr*, 369 U.S. 186, 217 (1962), the Supreme Court identified six factors to be considered in determining whether an action presents a non-justiciable political question: (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; (2) a lack of judicially discoverable and manageable standards for resolving it; (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; (4) the impossibility of a court's undertaking

---

nations must make following wars, decisions that the United States and its Allies made in negotiating the 1947 Peace Treaty and subsequent agreements with Hungary. As explained below, such issues are more appropriately addressed through government-to-government negotiation, not civil litigation in United States courts.

independent resolution without expressing lack of the respect due coordinate branches of government; (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question.  These six factors are evaluated individually, and where any one of the *Baker* factors is inextricable from the case, the court should dismiss a case as presenting a non-justiciable political question.  *Id.*  Several of the *Baker* factors counsel for dismissal of this case, particularly the first, fourth, and fifth factors.

It is beyond dispute that United States foreign relations and foreign policy are "demonstrably committed by our Constitution not to the courts but to the political branches."  *Joo v. Japan*, 413 F.3d 45, 52 (D.C. Cir. 2005) (dismissing war-related claims against Japan based on peace treaties entered into by various foreign states with Japan following World War II).  Further, it is beyond dispute that the United States has actively engaged in foreign policy directives aimed at resolving compensation and restitution claims relating to World War II and the Holocaust through political negotiations and international agreement, not through the federal court system.  *See Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57, 59 (2d Cir. 2005) ("The past two presidential administrations, notwithstanding their differences in political affiliation, have committed the United States to a policy of resolving Holocaust-era restitution claims through international

44

agreements rather than litigation.").  As discussed below, the historical record is clear that the United States has made the decision to specifically address claims against Hungary arising out of World War II and the Holocaust through international negotiation.  Moreover, adjudicating Plaintiffs' claims would require the district court to pass judgment not only on the sufficiency of Hungary's compliance with its responsibilities under Article 27 of the 1947 Peace Treaty, but also on the sufficiency of the Hungarian Constitutional Court's decision regarding Hungary's compliance, and to inject itself impermissibly into foreign policy choices made by the political branches of the United States Government starting over half a century ago.

Additionally, the fourth and fifth *Baker* factors would be impacted if the district court were to review and comment upon the Executive Branch's decision to enter into the 1947 Peace Treaty.  Contrary to Plaintiffs' assertion, Article 27 of the 1947 Peace Treaty expressly addressed and resolved the issue of compensation of Hungarian Jews for Holocaust-related confiscation of property.  *See* JA-89; JA-105-115.  The introduction to the 1947 Peace Treaty clearly explains that the purpose for entering into the treaty was to "settle questions still outstanding as a result of [World War II] and form the basis of friendly relations between" Hungary

and the Allied Powers, including the United States.  JA-80.[26]  This statement also makes clear that issues arising out of World War II, which included issues relating to Holocaust reparations,[27] were handled through diplomatic negotiations resulting in the 1947 Peace Treaty.  And, the inclusion of Article 27 dealing with Holocaust reparations by Hungary demonstrates that this issue was reserved to the policy judgment of the United States Executive Branch.

Plaintiffs attempt to paint Article 27 of the 1947 Peace Treaty as doing nothing more than "declar[ing] a standard of international law" (Pls.' Br. at 36-37), and a recognition by Hungary of its obligation to compensate Holocaust victims such as Plaintiffs in this action.  This reading completely ignores the introductory language cited above, which makes clear that the 1947 Peace Treaty was designed to "settle questions" that remained outstanding following the war.  Moreover, it ignores the subsequent legislation enacted in Hungary that was designed to comply

---

[26] The 1947 Peace Treaty was not negotiated solely between the United States and Hungary.  Rather, the other signatories were the Union of Soviet Socialist Republics, the United Kingdom of Great Britain and Northern Ireland, Australia, the Byelorussian Soviet Socialist Republic, Canada, Czechoslovakia, India, New Zealand, the Ukranian Soviet Socialist Republic, the Union of South Africa, and the People's Federal Republic of Yugoslavia.  JA-74-104.  Judicial adjudication of Plaintiffs' claims would, therefore, not only require the District Court to pass judgment on the policy decisions of the United States Executive Branch in entering into the 1947 Peace Treaty, but on the decisions of these other nations as well.

[27] The inclusion of Article 27 in the 1947 Peace Treaty which deals with post-war reparations  undercuts Plaintiffs' attempts to distinguish the Holocaust from World War II.  *See*  Pls.' Br. at 37 n.18.

with the obligations Hungary undertook in the 1947 Peace Treaty. *See* JA-69-70 ¶¶ 23-25, 28-29. Most importantly, the 1947 Peace Treaty not only required Hungary to compensate victims of World War II, but it also established an exclusive diplomatic forum for resolving any disputes concerning Hungary's treaty obligations. JA-93 (1947 Peace Treaty at Art. 40).

Similarly, Plaintiffs attempt to downplay the significance of the 1973 Executive Agreement entered into between the United States and Hungary. Plaintiffs do not argue that the 1973 Executive Agreement is merely declaratory; in fact, as Plaintiffs point out, "[t]he Executive Agreement provides that, in exchange for a lump sum payment by Hungary of about $19 million, there would be a 'full and final settlement . . . and discharge of all claims of the Government and nationals of the United States . . ." Pls.' Br. at 22-23; JA-107. Rather, Plaintiffs contend that the 1973 Executive Agreement does not apply to their claims in this case because none of Plaintiffs were United States nationals "at the time the claims arose." Pls.' Br. at 40. Plaintiffs' argument, however, misses the point. Regardless of whether the 1973 Executive Agreement applies to any of Plaintiffs in this case who are now United States nationals, the agreement demonstrates the Executive Branch's policy decision that claims against Hungary arising out of World War II and the Holocaust should be resolved through government-to-government negotiations, not civil litigation.

47

Because the Executive Branch has already addressed Hungary's responsibilities regarding reparations following World War II and the Holocaust through both the 1947 Peace Treaty and the 1973 Executive Agreement, Plaintiffs' claims asserted in this case present non-justiciable political questions.  As a result, to the extent this Court rejects the district court's finding of immunity for Hungary and MÁV, it should nevertheless uphold the dismissal of Plaintiffs' Amended Complaint.

### B.    Post-War Reparations Claims Have Traditionally Been Resolved Through Diplomatic Negotiations, Not Litigation

The Executive Branch's decision to address post-World War II reparations with Hungary through diplomatic means is consistent with how the United States has historically handled these issues.   Reparations[28] following a war have consistently been resolved through state-to-state negotiations rather than civil litigation.  *See Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 485 (D.N.J. 1999) ("As an issue affecting U.S. relations with the international community, war reparations fall within the domain of the political branches and are not subject to judicial review.") (citing *Oetjen v. Central Leather, Co.*, 246 U.S. 297, 302

---

[28] War reparations have been defined to include "all the loss and damage to which . . . Governments and their nationals have been subjected as a consequence of the war imposed upon them."  *Burger-Fischer v. Degussa AG*, 65 F. Supp. 2d 248, 275 (D.N.J. 1999) (quoting *Treaty of Peace Between the Allied and Associated Powers and Germany*, June 28, 1919, Art. 231, 1 Bevans 43, 137-38).

(1918)).[29]   Notwithstanding Plaintiffs' attempt to separate the Holocaust-related

claims from other World War II-related reparations claims, *see* Pls.' Br. at 37 n.18,

Holocaust-related reparations claims have consistently been handled through the

political process rather than the judicial system.  Indeed, post-war reparations have

been discussed and negotiated by governments as much as those relating to the

mistreatment of Jews during World War II.  And, courts have routinely dismissed

claims for compensation relating to the Holocaust on political question grounds,

finding that the United States has made a policy decision to "resolv[e] Holocaust-

era restitution claims through international agreements rather than litigation."

*Whiteman*, 431 F.3d at 59.

As the Supreme Court has explained, the Executive Branch has engaged in a

practice of settling claims in the aftermath of war in order to remove "sources of

friction" that present an "impediment to resumption of friendly relations" between

nations.  *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420-21 (2003) ("The issue of

---

[29] Constitutional separation of powers principles and the political question doctrine
dictate that a core foreign policy issue such as post-war reparations is the province
of the political branches of government.  *See Baker v. Carr*, 369 U.S. 186, 211-13
(1962); *Oetjen*, 246 U.S. at 302 (conduct of foreign affairs "is committed by the
Constitution to the executive and legislative -'the political'- departments of the
government"); *United States v. Martinez*, 904 F.2d 601, 602 (11th Cir. 1990) (in
areas of foreign affairs, "the political question doctrine routinely precludes judicial
scrutiny") (citation omitted).  Indeed, one area of foreign affairs that is particularly
within the realm of presidential authority is the settlement and compromise of
foreign claims.  *See Dames & Moore v. Regan*, 453 U.S. 654, 680-83 (1981);
*United States v. Pink*, 315 U.S. 203, 229-30 (1942); *Belk v. United States*, 858 F.2d
706, 710 (Fed. Cir. 1988).

restitution for [Holocaust-related claims] has in fact been addressed in Executive Branch diplomacy and formalized in treaties and executive agreements over the last half century…").[30]   As a result, numerous United States federal courts have refused to pass judgment on claims against various sovereign entities and companies that were under the direction and control of the Nazi regime, holding that the resolution of these claims and compensation of the victims is more properly left to inter-Governmental negotiations.  *See, e.g., Kelberine v. Societe Internationale, Etc.*, 363 F.2d 989, 995 (D.C. Cir. 1966); *In re Nazi Era Cases Against German Defendants Litig.*, 129 F. Supp. 2d 370, 388-89 (D.N.J. 2001).  And, as the district court pointed out, the Supreme Court has explained that the "federal courts' proper role in adjudicating disputes arising overseas is clear: where principles of international comity are at issue, the appropriate branch to address grievances is the Executive, not the Judiciary."  JA-348.  The district court further noted:

> For this fundamental reason, over the past twenty years, numerous circuit courts called upon by Holocaust survivors to obtain redress from the modern-day governments of the nations which, in the 1930s

[30] The Executive Branch has stated that it is the "policy of the U.S. Government to resolve matters of Holocaust era restitution and compensation through dialogue, negotiation and cooperation."  Hearings on H.R. 293 before the Sub-Committee of Government Efficiency, Financial Management and Intergovernmental Relations of the House Committee on Government Reform, 107th Cong., 2d Sess., 24 (2002) (statement of Ambassador Bell); Hearings on Status of Insurance Restitution For Holocaust Victims and Heirs before House Committee on Government Reform, 107th Cong., 1st Sess., 77 (2001) (same).

> and 1940s, committed heinous crimes against Jewish members of their civilian populations, have dismissed the suits. With the exception of cases involving specifically identifiable expropriated art objects … those courts have found, as this Court finds today, that recompense for the victims of the Holocaust is unavailable from the Federal Judiciary.

JA-349 (collecting cases dismissing Holocaust-related claims).[31]

The cases Plaintiffs cite to support their argument that reparations claims like those they allege in this case are not within the exclusive province of the Executive Branch are inapposite. In *Alperin v. Vatican Bank*, the Ninth Circuit distinguished that case from other World War II-related reparations cases on the grounds that there was no applicable treaty or executive agreement covering the claims against the Vatican Bank. 410 F.3d 532, 549-50 (9th Cir. 2005). Indeed, the dissent in *Alperin* suggested that the Treaty of Peace with Italy controlled the case and compelled dismissal. *See id.* at 567-68. Because the case was at the motion to dismiss stage, however, the majority "accept[ed] the Complaint's

---

[31] Neither the Alien Tort Statute, 28 U.S.C. § 1350, nor the Torture Victim Protection Act of 1991, 106 Stat. 73, note to 28 U.S.C. § 1350, cited by Plaintiffs as examples of the "broad reach of federal judicial power," Pls.' Br. at 35-36 provide any support for Plaintiffs' claims in this case. If anything, the case law regarding these statutes shows that this case does not belong in a United States court. As the Supreme Court noted in the *Kiobel* case, jurisdiction in a United States court is improper in cases where, like in this case, all of the activities complained of took place on foreign soil and all of the parties were, at the time of the events at issue, foreign nationals. *See Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013). The fact that some of the plaintiffs are now, some 70 years later, U.S. citizens, does not cause Plaintiffs' claims to "touch and concern the territory of the United States … with sufficient force to displace the presumption against extraterritorial application [of U.S. jurisdiction]." *Id.* at 1669.

demarcation between the Vatican Bank, which [was] named as a defendant, and the Vatican, which [was] not named as a defendant." *Id.* at 550 n.11. The majority noted, however, that the Treaty of Peace with Italy may have some bearing on justiciability "[t]o the extent further discovery resolves the legal and political status of the Vatican bank vis-à-vis the Vatican and/or Italy." *Id.* There is no similar dispute about the sovereign status of Hungary and MÁV in this case, nor about the applicability of the 1947 Peace Treaty to them.

Moreover, the *Alperin* court analogized the facts of that case to other cases including *United States v Portrait of Wally*, No. 99 Civ. 9940, 2002 WL 553532 (S.D.N.Y. Apr. 12, 2002) and *Republic of Austria v. Altmann*, 541 U.S. 677 (2004) where the plaintiffs claimed that specific, identifiable assets allegedly taken from victims of the Holocaust remained in the possession of a sovereign entity. *Alperin*, 410 F.3d at 551-52 (holding that "[t]he presence of a foreign defendant with some relationship to a foreign government and claims stemming from World War II atrocities tinge this case with political overtones, but the underlying property issues are not 'political questions' that are constitutionally committed to the political branches"). Plaintiffs in this case are not seeking the return of such specific, identifiable assets, and, therefore, the *Alperin* case has no bearing on the issues before this Court.

In *Ungaro Benages v. Dresdner Bank AG*, the court found that the Foundation Agreement entered into between the United States and Germany covered the claims at issue and specifically provided that it did "not provide an independent legal basis for dismissal." 379 F.3d 1227, 1235 (11th Cir. 2004). Moreover, while the court did not dismiss the case on political question grounds based on the contents of the Foundation Agreement, it did dismiss the case on international comity grounds. The court found that the Foundation provided the proper forum for the plaintiff's grievances. *Id.* at 1240-41. Similarly here, the agreements reached between the United States and Hungary specifically contemplate that resolution of World War II restitution claims regarding Hungary would be resolved through the negotiation process or in Hungary, not through litigation in United States courts. *See* JA-74-104 (1947 Peace Treaty); JA-105-115 (1973 Executive Agreement). Under such circumstances, the Executive Branch has made the policy determination that these claims should be resolved through the political process rather than the legal process.[32]

In this case, as in all post-war reparation cases, the Executive Branch has made a policy determination to resolve reparation issues through diplomatic

---

[32] The other case cited by Plaintiffs in support of their argument, *Kadic v. Karadzic*, did not deal with restitution or reparations following a war in which the United States was engaged, and therefore, the court did not have a basis for determining that the Executive Branch had made a policy determination to resolve such claims through diplomatic negotiations. 70 F.3d 232, 249 (2d Cir. 1995), *reh'g denied*.

negotiations, not civil litigation.  The Executive Branch specifically addressed Hungary's responsibilities to those whose property was taken in Hungary during World War II through the 1947 Peace Treaty and the 1973 Executive Agreement. Plaintiffs' attempts to enforce additional responsibilities against Hungary in this suit, therefore, present a non-justiciable political question requiring dismissal of their claims.

## **CONCLUSION**

This Court should affirm the judgment of the district court because Hungary and MÁV are immune from suits in United States courts under the FSIA and because Plaintiffs' claims present non-justiciable political questions.

Dated: November 7, 2014

Respectfully submitted,

*/s/ Konrad L. Cailteux*
Konrad L. Cailteux
Gregory Silbert
B. Keith Gibson
Isabella C. Lacayo
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
Konrad.Cailteux@weil.com
Gregory.Silbert@weil.com
Keith.Gibson@weil.com
Isabella.Lacayo@weil.com

*Counsel for Defendants-Appellees The Republic of Hungary and Magyar Államvasutak Zrt.*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i).

1.     Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1), the brief includes 13,575 words.

2.     The brief has been prepared using Microsoft Word 2007 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word count of this word-processing system in preparing this certificate.

/s/ Konrad L. Cailteux
Konrad L. Cailteux

Dated: November 7, 2014

## CERTIFICATE OF SERVICE

I, Konrad L. Cailteux, hereby certify that on November 7, 2014, I caused a true and correct copy of the foregoing Opposition Brief of Defendants-Appellees The Republic of Hungary and Magyar Államvasutak Zrt. to be served on Plaintiffs-Appellants' counsel via this Court's electronic filing system pursuant to Fed. R. App. P. 25(c)(1)(D) and Circuit Rule (25)(c), as follows:

| | |
|---|---|
| Charles S. Fax | David H. Weinstein |
| Liesel Shopler | Weinstein Kitchenoff & Asher LLC |
| Rifkin, Weiner, Livingston, Levitan & Silver, LLC | 1845 Walnut Street |
| 7979 Old Georgetown Road | Philadelphia, PA  19103 |
| Bethesda, MD  20814 | |
| | |
| L. Marc Zell | Paul G. Gaston |
| Zell, Aron & Co. | Law Offices of Paul G. Gaston |
| 34 Ben Yehuda Street | 1901 Pennsylvania Avenue, N.W. |
| Jerusalem 9423001 Israel | Washington, D.C.  20006 |

/s/ Konrad L. Cailteux
Konrad L. Cailteux

57